IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,563

DOUGLAS R. PETERS,
*Appellant*,

v.

DESERET CATTLE FEEDERS, LLC,
*Appellee*.

SYLLABUS BY THE COURT

1.

The law in Kansas generally favors employment at will, but it also recognizes implied-in-fact employment contracts in certain circumstances. For under Kansas law, parties may become contractually obligated by their conduct as well as by their use of oral or written words.

2.

Evidence of an implied-in-fact contract shows a mutual intent to contract. So an implied contract cannot be established solely by the employee's subjective understanding or expectation of his or her continued employment.

3.

The intent of contracting parties is normally a question of fact for the jury, and the determination of whether there is an implied-in-fact employment contract requires a factual inquiry.

1

4.

In deciding whether summary judgment is appropriate, a court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

5.

Promissory estoppel is an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonably inducing another party to undertake some obligation or to incur some detriment as a result.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 26, 2016. Appeal from Haskell District Court; BRADLEY E. AMBROSIER, judge. Opinion filed March 29, 2019. Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed, and the case is remanded with directions.

*John M. Lindner*, of Lindner, Marquez & Koksal, of Garden City, argued the cause and was on the briefs for appellant.

*Alan L. Rupe*, of Lewis Brisbois Bisgaard & Smith LLP, of Wichita, argued the cause, and *Jeremy K. Schrag*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, C.J.:  This is an employment case arising out of the sale of a cattle feedlot. The district court held that Douglas R. Peters, who moved his employment from the old owner to the new—Deseret Cattle Feeders, LLC (Deseret)—was Deseret's employee at will. In short, Deseret could terminate Peters' employment at any time without cause. So

the court granted summary judgment to Deseret on Peters' claims of breach of implied-in-fact employment contract and promissory estoppel.

The Court of Appeals panel reversed, holding that whether Peters' employment was at will—or protected by an implied-in-fact contract—was a disputed question of fact precluding summary judgment.

Where, as here, no definite term of employment is expressed, the duration of employment depends on the intention of the parties as determined by the circumstances of each particular case. *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 54-55, 551 P.2d 779 (1976). Under the circumstances of this particular case, we agree with the panel. As required by caselaw, Peters' implied-in-fact employment contract claim is supported by more than his own subjective understanding or expectation. And whether a meeting of the minds existed between Peters and Deseret on such a contract presents a genuine issue of material fact preventing summary judgment.

As a result, we affirm the panel's decision reversing summary judgment on this claim and the one for promissory estoppel. We remand to the district court for further proceedings.

FACTS AND PROCEDURAL HISTORY

Hitch Enterprises, Incorporated (Hitch) owned and operated a Haskell County feedlot licensed to feed more than 47,000 head of cattle. As Hitch's shop manager, Peters was responsible for supervising two to three individuals in the shop and for keeping all of the equipment running. When Peters began working for Hitch in 2006, he signed a statement acknowledging he was an employee at will.

In 2010, Hitch sold the enterprise to Deseret. While Hitch custom fed cattle for a variety of different owners, Deseret exclusively feeds cattle coming from the 10 ranches operated by its parent company AgReserves, Inc.

In May or early June 2010, Hitch called a company meeting and told its employees it was selling its feedlot to Deseret. No Deseret representatives attended the meeting. There, Hitch representatives told their employees they were welcome to look into transferring to other Hitch locations—two feedlots near Guymon, Oklahoma—if they were unable to work for Deseret.

According to the later deposition testimony of Hitch employee Lew Branscum, Hitch also told its employees the sales agreement provided there would be no layoffs and if the former Hitch employees did their jobs after Deseret took over, Deseret would keep them. Any reduction in workforce would be through attrition from retirements and voluntary resignations.

Two Hitch managers, Ronnie Pruitt and Dale Nicodemus, were not retained. During their depositions, they testified that Deseret warned them against enticing any current Hitch employees to go with them. In sum, Deseret needed the employees to keep operating the feedlot.

In June 2010, Deseret representatives held meetings to introduce themselves to the Hitch employees. David Secrist, Vice President of Cattle for AgReserves, Inc., and Michael Archibald, General Manager for Deseret (who eventually replaced Pruitt), met with groups of Hitch employees from each of the departments, i.e., shop and yard, feed and mill, and animal health. At the time of these meetings, Deseret was unfamiliar with Hitch's individual employees and their experience levels, work history, disciplinary history, attendance, or productivity levels. Secrist and Archibald gave each of the

4

departmental groups a brief background of their experience and explained Deseret's philosophy, organization, and history.

According to Hitch manager Pruitt's deposition testimony, at these departmental meetings, Deseret representatives—presumably Secrist—specifically, said, "[W]e hope the employees stay. You know, we value your tenure with the company. We want you to stay with us." Pruitt further testified that a Deseret representative said,

> "*They weren't going to get rid of anybody. . . . By any means of releasing them, firing them.* If they left on their own they would not hire people back. As far as their employee numbers would be smaller than what Hitch had, so they did not need a manager. They didn't—well, they did bring their own in. They did not need an assistant manager. *As people left, they were going to get their employees down through attrition as they left, rather than to let them go.*" (Emphasis added.)

Similarly, in the deposition of Hitch manager Nicodemus, he testified "it was indicated" that Deseret was "not planning to lay off anybody" and was "going to continue to operate at full strength." Peters essentially testified to the same effect. According to Peters, Deseret representatives told Hitch employees that—there would be no layoffs, employment would be secure, current employees would continue to be employed as long as they did their jobs, and any reduction in workforce would be limited to attrition from retirements or voluntary resignations.

In July 2010, Deseret's Archibald and Secrist met with the Hitch employees individually, including Peters. Archibald took notes of the interview on Peters' mechanical experience and experience with fleet management software.

5

After the individual meetings, Deseret held a large group meeting with the Hitch employees at the Clarion Hotel in Garden City. There, Deseret explained its insurance and profit sharing plan and discussed its vacation and pay practices.

With the exception of Hitch's management team of Pruitt and Nicodemus, Deseret hired every Hitch employee who wanted a job. The employees were hired at the same or similar pay and experience level as they had held with Hitch. Peters began his Deseret employment on November 1, 2010, in the same position and title as at Hitch: shop manager.

The sale closed the next day. Later that month, Hitch hosted a final cookout for its former employees. There, Chris and Jason Hitch thanked their employees for their many years of service. Deseret representatives, including Archibald and Secrist, did not make any announcements there. Of the 40 to 50 total Hitch employees, 13 left at the time Deseret took over the enterprise. Another eight employees would eventually quit after initially deciding to continue with Deseret.

Upon starting his Deseret employment, Peters carried over his unused vacation time from Hitch. He also signed several personnel-related acknowledgments for Deseret. One was a "Consent to Test for Alcohol or Drugs" acknowledgement that stated "refusal by me to sign this consent will be cause for termination or ineligibility for employment." A second document Peters signed related to alcohol and drug screening and provided he would be required to meet all established standards of conduct and job performance. His failure to meet any of the requirements would result in immediate termination. The form further provided: "Nothing contained herein shall be construed as a waiver of [AgReserve's] right to take normal employment disciplinary actions against me under existing policies and procedures for unsatisfactory work performance or misconduct." A third document, signed later, was a Wrangler Jeans Purchase Agreement. It stated if

6

Peters' employment ended with Deseret "for any reason," his unpaid Wrangler purchase would be deducted from his last check. But in contrast to the start of Peters' employment with Hitch four years earlier, he did not sign an acknowledgment of at-will employment with Deseret.

In the spring of 2011, Deseret made operational changes to its use and repair of feedlot machinery and equipment. Instead of relying on full-time employees, Deseret started using contract labor for specialized work such as assisting with rebuilding pens and repairing heavy equipment. And Deseret started replacing Hitch's aging equipment and machinery with newer equipment operated under factory warranty programs, which included factory scheduled maintenance. Deseret also reduced the equipment necessary for its operation. While Hitch had used seven feed trucks, Deseret only uses four. And although Hitch had 20 pickups, Deseret only has about 11.

In June 2011, because of the operational changes, and despite being satisfied with Peters' job performance, Deseret terminated his employment. Deseret offered Peters a severance package as part of his termination. Peters refused without explanation.

Approximately two years later, Peters filed suit against Deseret alleging breach of an employment contract, or in the alternative detrimental reliance and estoppel. For damages, he claimed $49,440 in lost severance pay he did not receive from Hitch when he decided instead to accept employment with Deseret. He also claimed $21,963.11 in lost wages for 10 months following his termination and lost benefits of $3,323 for health insurance and a vehicle and cell phone that he had received through his employment.

Deseret ultimately moved for summary judgment. It argued the undisputed facts showed that Peters was an at-will employee who could be terminated at any time without cause.

7

In response, Peters identified four controverted facts he alleged were material and precluded summary judgment: (1) in Deseret's offer of employment, it assured Peters that if he chose to work for Deseret, his employment would be secure, there would be no layoffs, he would continue to be employed for as long as he continued to perform his job, and any reduction in workforce would be limited to reduction by attrition resulting from retirements and voluntary resignations; (2) Hitch made a severance offer applicable to employees who did not want to work for Deseret and the terms of that offer; (3) Deseret knew of any severance offers made by Hitch; and (4) Peters reasonably relied on the Deseret offer to his detriment.

In support, Peters cited declarations from four Hitch employees—Pruitt, Nicodemus, Branscum, and Lawrence Guerrero. They each signed identical declarations in June or July 2013—though each later retracted the declarations to varying extents during their depositions. All of the declarations contained only the same three paragraphs:

> "1. On or about November 2, 2010 when Deseret Cattle Feeders, LLC took over Hitch Feeders, I was an employee of Hitch Feeders.

> "2. The employees were given the option of going to work for the new company, Deseret Cattle Feeders, LLC or, if the employees did not want to work for the new company, Hitch Feeders was offering 1 year salary.

> "3. At this meeting, Deseret Cattle Feeders, LLC representatives promised that if we went to work for the new company, Deseret, that our employment would be secure. They promised that there would be no layoffs, present employees would continue to be employed as long as they did their jobs, and that any reduction in workforce would be limited to reduction by attrition from retirements or voluntary resignations."

8

The declarations were signed, "I declare, verify and certify under penalty of perjury that the foregoing is true and correct."

Per Guerrero's later deposition, he may not have read the declaration before signing it. He went on to testify, however, that Deseret held a meeting after it had taken over the business and "fired five guys in one day . . . . [T]here was a meeting that same evening that they fired them, and they said everybody present at this meeting does not have to worry about their job. [T]heir jobs was secure, that there wouldn't be no more layoffs."

Deseret replied by arguing Peters' claim was only supported by self-serving statements. It contended Peters presented no corroborating evidence to show an implied-in-fact contract or the elements of promissory estoppel.

The district court granted summary judgment to Deseret. It ruled that none of the material facts were controverted and that Peters' employment with Deseret was at will, i.e., there was no evidence for finding an implied-in-fact contract. The court further held that on Peters' claim of promissory estoppel, Deseret had not induced him to detrimentally move laterally from one at-will position at Hitch to another one at Deseret.

The Court of Appeals panel reversed on both Peters' claims. Viewing the evidence in the light most favorable to Peters as the opponent of the summary judgment motion, the panel held—among other things—that his expectations about the purported employment contract were not unilateral. So whether he was an employee-at-will could not be determined by the court as a matter of law, but only by the jury as a matter of fact. *Peters v. Deseret Cattle Feeders, LLC*, No. 113,563, 2016 WL 4499965 (Kan. App. 2016) (unpublished opinion).

9

This court granted Deseret's petition for review under K.S.A. 20-3018(b), obtaining jurisdiction under K.S.A. 60-2101(b).

ANALYSIS

The parties continue to argue about whether genuine issues of material fact exist on Peters' claims that (1) he had an implied-in-fact employment contract; and (2) Deseret had induced him to detrimentally rely on its statements about continuing employment without the possibility of layoffs.

*Standard of review*

Because this case was decided under K.S.A. 60-256, summary judgment standards are applied on appellate review. An appellate court reviews summary judgment de novo. *South Central Kansas Health Ins. Group v. Harden & Co. Ins. Services, Inc.*, 278 Kan. 347, 350, 97 P.3d 1031 (2004) (citing *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 820, 934 P.2d 65 [1997]).

Our summary judgment standard is well-known:

"'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and *where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment*

10

*must be denied*. [Citations omitted]. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).'" (Emphasis added.) *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 358-59, 352 P.3d 1032 (2015).

As summarized by the United States Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), in this case we must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

Issue 1: *Summary judgment should not have been granted for Deseret on Peters' implied-in-fact employment contract claim.*

The law in Kansas generally favors at-will employment. The employment-at-will doctrine holds that employees and employers may terminate an employment relationship at any time for any reason, unless there is an express or implied contract governing the terms of employment. *Lumry v. State*, 305 Kan. 545, 562, 385 P.3d 479 (2016); see *Johnson*, 220 Kan. 52, Syl. ¶ 1 ("In the absence of a contract, express or implied, between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged.").

We have recognized implied-in-fact employment contracts in certain circumstances. For under Kansas law, parties may become contractually obligated by their conduct as well as by their use of oral or written words. *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 273, 50 P.3d 495 (2002) (citing *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363-64, 736 P.2d 917 [1987]).

11

"A contract implied in fact arises from facts and circumstances showing mutual intent to contract." *Mai v. Youtsey*, 231 Kan. 419, 422, 646 P.2d 475 (1982). Because the intent must be mutual, an implied contract cannot be established solely by the employee's subjective understanding or expectation of his or her employment. *Hall*, 274 Kan. at 273 (citing *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 133, 815 P.2d 72 [1991]); see also *Allsup v. Mount Carmel Med. Center*, 22 Kan. App. 2d 613, 617-18, 922 P.2d 1097, *rev. denied* 260 Kan. 991 (1996) (discussing the implied contract theory exception).

This court has held that the "intent of the contracting parties is normally a question of fact for the jury and . . . the determination of whether there is an implied contract in employment requires a factual inquiry." *Morriss v. Coleman Co*., 241 Kan. 501, 512, 738 P.2d 841 (1987). In making that particular determination, the understanding and intent of the parties should be ascertained from consideration of several factors:  (1) written or oral negotiations, (2) the parties' conduct from the beginning of the employment relationship, (3) the usages of the business, (4) the situation and objective of the parties giving rise to the relationship, (5) the nature of the employment, and (6) any other circumstances surrounding the employment relationship that tend to explain or clarify the parties' intentions at the time employment began. *Hall*, 274 Kan. at 273 (quoting *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 684 P.2d 1031 [1984]). Intent is obviously a state of mind, and "[a] court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties." *Henrickson v. Drotts*, 219 Kan. 435, 438, 548 P.2d 465 (1976).

The panel correctly observed in reviewing a summary judgment it was required to view the evidence in the light most favorable to Peters. See *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011) (courts required to resolve all facts and inferences which

12

may reasonably be drawn from evidence in favor of party against whom ruling is sought). After doing so, it found several *Hall* factors supported his claim that his employment was more than at will and that Deseret could have intended an implied-in-fact contract of employment.

Specifically, Deseret wanted to retain Hitch employees, who would be crucial for continued operation of the 47,000 head feedlot during the transition and beyond. Deseret warned departing managers Pruitt and Nicodemus against poaching Hitch employees. Additionally, Hitch managers were under the impression that as part of the sales contract, there would be no layoffs of Hitch employees. They relayed this view to the Hitch employees. While Hitch's comments to employees are not binding on Deseret, these representations provide at least some support for Peters' understanding of the nature of the new employment relationship.

More important, Pruitt, Branscum, Nicodemus, Guerrero, and Peters all confirmed that Deseret representatives told employees there would be no layoffs and any reductions in staffing would be through attrition rather than firing. Additionally, Peters testified that Deseret assured the Hitch employees continued employment as long as they did their jobs. This is all consistent with Deseret's need to obtain and retain experienced employees to run the feedlot. And further supports Peters' understanding of Deseret's intentions toward his employment status.

At oral arguments before this court, counsel for Deseret acknowledged that its representatives probably made statements that Deseret would not lay off employees once it took over the feedlot. But counsel dismissed the statements as mere "fluff." He argued such "fluff" was not enough to form an implied-in-fact employment contract. According to counsel, under the employment-at-will doctrine, Deseret can make general statements

13

of intent about long-term employment for its new employees without apparent consequence.

We disagree with Deseret and agree with the Court of Appeals panel. The enticing oral statements from the new employer cannot be dismissed as fluff because they help in determining whether a meeting of the minds existed between Deseret and Peters to form an implied-in-fact contract. In fact, they tend to support Peters' assertion that one existed. More specifically, they help demonstrate the parties' intent from the beginning of the employment relationship as well as the situation and objective of the parties giving rise to that relationship. *Hall*, 274 Kan. at 273; see *Henrickson*, 219 Kan. at 438 (court should be cautious in granting motion for summary judgment when resolution of dispositive issue requires determination of state of mind of one or both parties).

We also observe other facts regarding the parties' state of mind, i.e., intent, that caution against granting summary judgment. First, documents Peters was required to sign as he began Deseret's employment, e.g., relating to testing for drugs and alcohol, could be reasonably interpreted to suggest he would be disciplined only for violations of company policy—and not for "no cause." Discipline would include "immediate termination" for failing "to meet all established standards of conduct and job performance."

Second, a document Peters was not required to sign as he began Deseret employment—i.e., an acknowledgment that he was an employee at will—coupled with Peters' knowledge that he was required to sign such an acknowledgment for Hitch when he began work there, could suggest to him that he was not such an employee for Deseret. This combination of Deseret (1) requiring Peters to sign documents identifying discipline for unsatisfactory work performance or misconduct and (2) not requiring him to sign any documents establishing his employment was at will—could lead Peters to reasonably infer from Deseret that he had an implied-in-fact contract terminable only for cause.

14

As we said in *Morriss*, 241 Kan. at 514:

> "There has been no trial in this case, and we only hold that the evidence presented in the
> record at the time summary judgment was granted was insufficient to require summary
> judgment in favor of defendants as a matter of law. The ultimate decision of whether
> there was an implied contract not to terminate the plaintiffs without just cause must be
> determined from all the evidence presented by the parties on that issue. We thus hold that
> the trial court erred in sustaining the defendants' motion for summary judgment as to that
> implied contract claim."

Considering the *Hall* factors, we conclude that the particular circumstances of this
case present a genuine issue of material fact as to the intent of the parties entering this
employment relationship, i.e., was there a meeting of the minds in order to create an
implied-in-fact contract? In short, the evidence is not so one-sided that Deseret must
prevail as a matter of law. See *Anderson*, 477 U.S. at 251-52. So we affirm the decision
of the panel reversing summary judgment and remand for further proceedings.

Issue 2: *Summary judgment should not have been granted for Deseret on Peters'
promissory estoppel claim.*

Deseret argues the panel erred in holding Deseret was not entitled to summary
judgment on Peters' promissory estoppel claim. It contends that because Peters failed to
come forward with any evidence that Deseret had knowledge of Hitch offering severance
packages, he cannot show Deseret reasonably foresaw that its offer of at-will
employment would result in Peters declining a severance offer from Hitch. *Osterhaus*,
291 Kan. 759, Syl. ¶ 2 (defendant entitled to summary judgment if can establish absence
of evidence necessary to support essential element of plaintiff's case). And showing
Deseret's reasonable expectation of Peters' acting in reliance on its promise is required for

15

promissory estoppel. *Mohr v. State Bank of Stanley*, 244 Kan. 555, 574, 770 P.2d 466 (1989).

Peters responds that the district court did not reach this issue; its ruling entirely focused on the at-will employment contract issue. Because the district court did not go on to consider whether a severance package was available to Peters from Hitch, Peters argues this court should affirm the panel's decision reversing summary judgment and remanding this issue to the district court for consideration as well.

Before beginning our analysis, we note that promissory estoppel is "an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonably inducing another party to undertake some obligation or to incur some detriment as a result." *Bouton v. Byers*, 50 Kan. App. 2d 34, 41, 321 P.3d 780 (2014), *rev. denied* 301 Kan. 1045 (2015).

In granting Deseret summary judgment on this issue, the district court held that Peters was an at-will employee and cited *Chrisman v. Philips Industries, Inc.*, 242 Kan. 772, 780-81, 751 P.2d 140 (1988). There, we held no detrimental reliance existed to support promissory estoppel when the plaintiff simply moved from one at-will employment position to another. We reasoned such a move did not harm the employee. So for Peters, the district court concluded he could not rely on any inducement by Deseret for a lateral change in position from Hitch's at-will shop manager to Deseret's at-will shop manager.

The district court did not analyze the remaining elements of promissory estoppel, holding that regardless of whether a severance package existed, Peters did not rely on Deseret's inducement for a lateral change in position. See *Osterhaus*, 291 Kan. 759, Syl. ¶ 2.

16

The panel distinguished *Chrisman*, holding that whether Peters merely traded one at-will position for another is disputed. As we concluded above, while Peters signed a written acknowledgment in 2006 that he was an employee at will for Hitch, he signed no such acknowledgment for Deseret. And genuine issues of material fact remain on the question of his employment status with Deseret. Like the panel, we hold that because the question remains about whether Peters' employment with Deseret was at will or through an implied-in-fact contract, *Chrisman* is not controlling.

We affirm the judgment of the Court of Appeals, reverse the district court's order granting summary judgment, and remand for further proceedings in accordance with our decision.